UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

CLARENCE MOSS,                            :

                         Petitioner,     :    06 Civ. 6178 (SAS)(HBP)

     -against-                           :    REPORT AND
                                              RECOMMENDATION
DALE ARTUS, Superintendent,              :

                         Respondent.     :

----------------------------------X

          PITMAN, United Stated Magistrate Judge:


          TO THE HONORABLE SHIRA A. SCHEINDLIN, United States

District Judge,


I.   Introduction


          Clarence Moss, by his pro se petition, seeks a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, vacating a judgment

of conviction entered on March 4, 2003, after a jury trial in the

Supreme Court of the State of New York, Bronx County (Bamberger,

J.), for one count of murder in the first degree and two counts

of sexual abuse in the first degree, in violation of New York

Penal Law Sections 125.27(1) and 130.65(1), respectively.

Petitioner was sentenced to a term of imprisonment of life

without the possibility of parole on the murder count and two

determinate sentences of seven years imprisonment on each of the

sexual abuse counts, all sentences to run concurrently.  Peti-
tioner is currently incarcerated pursuant to that judgment.

For the reasons set forth below, I recommend that the
petition be denied in all respects.

## II. Facts

### A. Facts Underlying Petitioner's Conviction

The evidence offered at trial established the following
facts.[1]

On the afternoon of May 8, 2001, detectives of the New
York City Police Department discovered the dead body of eleven-
year-old Tammy G.[2] on a staircase landing between the sixth floor
and the roof of the Bronx apartment building in which she and the
petitioner both resided.  A trail of blood and vomit lead from
the body to Apartment 6E, the apartment in which petitioner
resided.  There was also vomit on the door and door saddle of
Apartment 6E and on the floor in front of Apartment 6E.

---

[1]The resolution of petitioner's claims does not require
extensive analysis of the facts underlying petitioner's
conviction.  Accordingly, the facts set forth herein are based on
the statement of facts set forth in the prosecution's brief to
the Appellate Division of the Supreme Court (Respondent's Brief,
dated July, 2007 ("Resp. Brf."), at 15-23, annexed as Exhibit 2
to the Affidavit of Assistant District Attorney Bryan C. Hughes,
sworn to July 11, 2007 ("Hughes Aff.")).

[2]Because of her age and the nature of the offense, the
record does not disclose the victim's last name.

Shortly after the body was discovered, the police conducted a canvass of the building and knocked on the door of petitioner's apartment. Petitioner told the police that he had been asleep and knew nothing about the homicide. When petitioner's wife arrived home from her job later that afternoon, the police requested and received her consent to enter Apartment 6E.

After entering the apartment, the police advised petitioner that the victim's body had been found close to the door of his apartment, and he again denied knowledge of any murder. While in the apartment at this time, New York City Police Detective Christopher Mordecai observed what he believed to be a small drop of vomit on a rug behind the apartment door. The police asked petitioner to accompany them to the station house for questioning, and he agreed. Petitioner then dressed and accompanied the detectives to the station house.

At approximately the same time that detectives were questioning petitioner, a medical examination of Tammy G.'s body disclosed that she had been sexually assaulted and died as a result of "'smothering and compression of her neck'" (Resp. Brf. at 19, quoting the Trial Testimony of Dr. Steven Shapiro). Tammy G's murder could have been caused by a pillow being placed over her face or a hand or other object being placed on her throat.

While petitioner was being questioned, Detective Mordecai obtained a search warrant for apartment 6E; the warrant

was executed at approximately 11:27 p.m. on May 8, 2001.  During the search, the police recovered, among other things, a blood- and vomit-stained sheet, a pillow case, a stained sock and the piece of the carpet that appeared to contain vomit.

Petitioner was questioned for approximately 41 hours. During the course of the questioning, a blood sample was drawn and the clothes he was wearing were seized.

Blood stains on the pillow case recovered from peti- tioner's apartment were subsequently determined to match Tammy G.'s DNA profile.  DNA recovered from vomit on the door saddle to petitioner's apartment and the floor outside petitioner's apart- ment also matched Tammy G's DNA profile.  Only one in more than a trillion Hispanic individuals would have the same DNA profile as the one derived from the foregoing blood and vomit stains; the world's population is currently approximately six billion.  Two non-blood stains on legs of petitioner's pants were also found to contain DNA that matched the profiles of petitioner and Tammy G. A stain consistent with vomit was also recovered from peti- tioner's sneakers, although not enough DNA could be extracted from it to permit testing.

B.  State Court
    Proceedings

Prior to trial, petitioner moved to suppress, among other things, the items seized from his apartment and the cloth-

ing seized from him during his interrogation. The Trial Court conducted a hearing and heard argument with respect to petitioner's motion to suppress physical evidence on July 15, 16, 18, 19, 22, 24 and August 7, 2002. A total of eleven witnesses testified. Justice Bamberger also visited the station house at which petitioner was interrogated to view first-hand the physical surroundings under which petitioner was interrogated.

In support of his motion to suppress the physical evidence, petitioner first argued that the search warrant application was based on information obtained during an illegal entry and should, therefore, be suppressed. Second, petitioner argued that the clothing seized during the course of the interrogation should be suppressed pursuant to People v. Natal, 75 N.Y.2d 379, 553 N.E.2d 239, 553 N.Y.S.2d 650 (1990) because it was seized during the course of the allegedly illegal detention of petitioner by the police and, because there was no reason to believe petitioner had worn the clothes during the commission of a crime, there was no reason to believe that the clothing was evidence (Resp. Brf. at 13).

Although the Trial Court ultimately granted petitioner's motion to suppress statements he made during the course of his interrogation, it rejected plaintiff's motion to suppress the physical evidence in its entirety. As to the first prong of petitioner's motion, the Trial Court concluded that the prosecu-

tion had established that petitioner's wife voluntarily consented

to the police entering the apartment she shared with petitioner

and that the warrant application was not, therefore, based on

illegally obtained information.

> Under the circumstances[, petitioner's wife] must have
> been aware that the police were conducting an investi-
> gation. Mordecai testified that when he arrived at the
> sixth floor there were already police on the scene and
> Mrs. Moss arrived after he did while the investigation
> was continuing. The route to her own apartment was
> obstructed by the police. Despite this awareness, she
> would have no reasons to tie the investigation to her
> apartment or to her husband. Thus, there was no reason
> for her to refuse a police request. Her permission for
> the detectives to enter the apartment was in response
> to a single question and there was no basis to conclude
> that the permission was anything other than a genuine
> response to Salvatore's question.

(Resp. Brf. at 11-12[3]).

The Trial Court also rejected petitioner's motion to

suppress the clothing seized from him during his interrogation,

stating:

> The credible testimony at the suppression hearing
> established that at the time that the assistant dis-
> trict attorney requested that the clothing worn by the
> defendant be seized she had spoken to the detectives
> about the investigation. Indeed, the evidence showed
> that the prosecutor's office was apprised of the prog-
> ress of the investigation at various points during the
> investigation. The accumulated information above
> showed that there was probable cause to believe that

---

[3]The Trial Court issued a comprehensive written decision
denying petitioner' motion to suppress the physical evidence.
Unfortunately, it has been omitted from the record, and I am
forced to rely on the summary of the decision contained in the
prosecution's brief to the Appellate Division of the Supreme
Court.

> the rape and murder took place in apartment 6E, that
> the clothing being worn by the defendant had been in
> the apartment at the time of the crime, that the cloth-
> ing was evidence related to the rape and homicide and
> that the evidence could be lost or destroyed if not
> immediately seized.

(Pet. Brf. at 13).

After being found guilty by the jury, the Trial Court

sentenced petitioner to life without parole on the murder count

(see Brief of Defendant-Appellant Clarence Moss, dated Mar. 21,

2005 ("Def. Brf."), at 20, annexed as Exhibit 1 to the Hughes

Aff.).  Since the prosecution had not sought the death penalty,

the Trial Court imposed sentence with no input from the jury (see

pages 21-23, below).

Assisted by counsel, petitioner appealed his conviction

to the Appellate Division of the Supreme Court, First Department.

Petitioner raised three issues on appeal:  (1) he was illegally

detained and interrogated for more than forty hours and that the

clothing seized from him during this period should be suppressed

as the product of an illegal detention by the police; (2) physi-

cal evidence seized pursuant to the warrant to search peti-

tioner's apartment should be suppressed because the warrant

itself was the product of an earlier warrantless and illegal

entry into petitioner's apartment, and (3) the sentence of life

imprisonment without the possibility of parole was imposed in

violation of petitioner's Due Process and Equal Protection

rights.

The Appellate Division rejected all of petitioner's claims in a terse decision:

> Defendant was convicted of the killing and sexual abuse of a 10-year-old neighbor who had returned from school. Her body was found in the hallway with a trail of vomit leading to the door of defendant's apartment. The court properly denied defendant's motion to suppress clothing seized from him while he was unlawfully detained, because the seizure was not the product of the illegal detention, but of police investigation, which established probable cause to believe that the clothing contained evidence (see e.g. People v Watson, 259 AD2d 380 [1999], lv denied 93 NY2d 1029 [1999]). In any event, were we to find any error regarding this ruling, we would find it to be harmless in view of the overwhelming evidence of defendant's guilt, with particular reference to DNA evidence that was found on a pillowcase recovered from inside defendant's apartment, and on the doormat outside his apartment.
>
> With regard to the other suppression issue raised on appeal, the record fully supports the court's determination that defendant's wife voluntarily consented to the initial police entry into the apartment, which determination is supported by the record (see e.g. People v Charbonier, 220 AD2d 221 [1995], lv denied 87 NY2d 899 [1995]).
>
> Defendant's constitutional challenge to the sentencing scheme for murder in the first degree is unavailing (People v Hansen, 99 NY2d 339 [2003]).

People v. Moss, 22 A.D.3d 329, 329-30, 802 N.Y.S.2d 148, 148 (1st Dep't 2005) (brackets in original).

The New York Court of Appeals denied leave to appeal on March 22, 2006 and again on June 14, 2006. People v. Moss, 7

N.Y.3d 759, 853 N.E.2d 256, 819 N.Y.S.2d 885 (2006); People v. Moss, 6 N.Y.3d 836, 847 N.E.2d 381, 814 N.Y.S.2d 84 (2006).[4]

   C.   The Pending
        Petition

        In the petition he initially filed, petitioner asserted only his claims that his Fourth Amendment rights had been violated by the seizure of his clothes and execution of the warrant to search his apartment (Docket Item 1).

        On August 14, 2006, the Honorable Kimba M. Wood, Chief Judge of the United States District Court for the Southern District of New York, issued an Order (Docket Item 2), advising petitioner that, pursuant to Stone v. Powell, 428 U.S. 465 (1976) and its progeny, alleged Fourth Amendment violations are generally not a basis for habeas corpus relief, and granting plaintiff leave to file an amended petition.

        Petitioner subsequently filed two documents, both of which are entitled "Amended Petition." On or about September 11, 2006, petitioner filed his first Amended Petition (Docket Item 4) (hereinafter referred to as the "Amended Petition"). On the pages of the preprinted form, petitioner states the grounds for his petition as follows:

_____

        [4]The record does not disclose why the New York Court of Appeals denied leave to appeal twice.

9

> Ground(s) (1)
>
> The police unlawfully detained and interrogated Clarence Moss for more than forty hours.
>
> Ground(s) (2)
>
> Evidence was seized unlawfully from Clarence Moss's home pursuant to the May 8, 2001 search warrant.
>
> Ground(s) (3)
>
> Clarence Moss's sentence of life imprisonment without parole was imposed in this case in violation of his rights to equal protection and due process of law as guaranteed by the U.S. Const. Amend XIV.

(Amended Petition, undated, filed on Sept. 11, 2006 (Docket Item 4), ¶ 13).  Petitioner attached a handwritten memorandum of law to this document, in which he argued that the clothing seized during his interrogation should have been suppressed and that his sentenced was imposed illegally.  This attached memorandum of law makes no mention of the search of petitioner's apartment pursuant to the search warrant.

On or about April 10, 2007, petitioner filed a second document entitled "Amended Petition" (Docket Item 6) (hereinafter referred to as the "Second Amended Petition").  The Second Amended Petition consists of a handwritten memorandum of law in which plaintiff addresses only the seizure of his clothing during the course of his interrogation and the legality of his sentencing.  Again, petitioner raises no issue concerning the search of his apartment.

Thus, it appears that petitioner is currently asserting two claims -- that the seizure of his clothing violated his Fourth Amendment rights and that his sentenced was imposed illegally.

On April 18, 2007, the Honorable Shira A. Scheindlin, United States District Judge, to whom this matter had been re-assigned, issued an Order directing the Clerk of the Court to serve upon the Attorney General of the State of New York and the District Attorney of Bronx County copies of the amended and second amended petition, along with all attached papers, and further directing that respondent answer those documents (Docket Item 7). According to the Court's Docket Sheet, however, the Clerk only served the Second Amended Petition and not the Amended Petition (Unnumbered Docket Entry dated May 1, 2007).

Respondent filed his opposition on July 11, 2007 (Docket Item 11), and addressed only petitioner's Fourth Amend-ment claims. Respondent does not even remotely address peti-tioner's claim concerning his sentence.

Despite respondent's failure to address petitioner's claim concerning his sentence, I conclude that the matter is ripe for resolution. As explained more fully below, petitioner's claim concerning his sentence has been rejected by the Court of Appeals for the Second Circuit. Accordingly, there is no reason to require respondent to brief petitioner's sentencing claim.

## III. Analysis

A. Petitioner's Fourth
   Amendment Claim[5] Does
   Not Provide a Basis
   for Relief Pursuant
   to Stone v. Powell

The limited scope of review available in habeas proceedings for alleged Fourth Amendment violations was explained by the Honorable Richard M. Berman, United States District Judge, in Baker v. Bennett, 235 F. Supp.2d 298, 306-07 (S.D.N.Y. 2002):

> In Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court established that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494, 96 S.Ct. 3037; Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992). A federal court "ha[s] no authority to review the state record and grant the writ simply because [it] disagree[s] with the result reached by the state courts" on a Fourth Amendment issue. Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977); see also Torres v. Irvin, 33 F. Supp.2d 257, 264 (S.D.N.Y. 1998) ("A petition for a writ of habeas corpus must be dismissed where it seeks simply to relitigate a Fourth Amendment claim."). The only way a federal court can review such a claim is where "the state has provided no corrective procedures at all," or the state has provided a corrective mechanism, but the defendant is precluded from using that mechanism "because of an unconscionable breakdown in the

---

[5]Although I conclude that petitioner is asserting a Fourth Amendment claim only with respect to the seizure of his clothing and not with respect to the search of his apartment, the analysis set forth herein is equally applicable to any claim that the search of petitioner's apartment violated his Fourth Amendment rights.

underlying process." <u>Capellan</u>, 975 F.2d at 70 (citing <u>Gates</u>, 568 F.2d at 839); <u>Torres</u>, 33 F. Supp.2d at 264.

<u>See</u> <u>also</u> <u>Wallace v. Kato</u>, 127 S.Ct. 1091, 1099 n.5 (2007); <u>Bridgefourth v. Artus</u>, 05-CV-535 (VEB), 2007 WL 4373524 at *3 (W.D.N.Y. Dec. 10, 2007); <u>Armsworth v. Graham</u>, 07 CV 3727 (JG), 2007 WL 4224643 at *4 (E.D.N.Y. Nov. 27, 2007); <u>Myers v. Laclair</u>, 06 Civ. 13321 (NRB), 2007 WL 3254902 at *7 (S.D.N.Y. Oct. 31, 2007); <u>Hall v. Griener</u>, 00 Civ. 5517 (WHP)(HBP), 2004 WL 350759 at *2-*3 (S.D.N.Y. Feb. 24, 2004); <u>Briggs v. Phillips</u>, 02 Civ. 9340 (SAS)(AJP), 2003 WL 21497514 at *5 (S.D.N.Y. June 30, 2003); <u>Skinner v. Duncan</u>, 01 Civ. 6656 (DAB)(AJP), 2003 WL 21386032 at *14 (S.D.N.Y. June 17, 2003); <u>Valtin v. Hollins</u>, 248 F. Supp.2d 311, 317 (S.D.N.Y. 2003); <u>Edwards v. Fischer</u>, 01 Civ. 9397 (LAK)(THK), 2002 WL 31833237 at *2 (S.D.N.Y. Dec. 16, 2002); <u>Torres v. Irvin</u>, 33 F. Supp.2d 257, 264 (S.D.N.Y. 1998).

The Court of Appeals for the Second Circuit has held that New York's procedure for reviewing Fourth Amendment claims is adequate. <u>See</u> <u>Capellan v. Riley</u>, 975 F.2d 67, 70 n.1 (2d Cir. 1992). <u>See</u> <u>also</u> <u>Armsworth v. Graham</u>, <u>supra</u>, 2007 WL 4224643 at *4; <u>Crispino v. Allard</u>, 378 F. Supp.2d 393, 413 (S.D.N.Y. 2005); <u>Castillo v. Miller</u>, 04 Civ. 6157 (GEL), 2005 WL 1036346 at *5-*6 (S.D.N.Y. May 4, 2005); <u>Edwards v. Fischer</u>, <u>supra</u>, 2002 WL 31833237 at *2; <u>Manning v. Strack</u>, CV 99-3874 (RR), 2002 WL 31780175 at *4 (E.D.N.Y. Oct. 11, 2002); <u>Crawford v. Artuz</u>, 165

F. Supp.2d 627, 637 (S.D.N.Y. 2001). Thus, petitioner cannot prevail under the first prong of Capellan because he was able to litigate his Fourth Amendment claim at a pre-trial hearing held on July 15, 16, 18, 19, 22, 24 and August 7, 2002 during which eleven witnesses testified and the Trial Justice actually visited the site of petitioner's detention and interrogation. In addition, petitioner was afforded the opportunity to litigate the claim again on direct appeal to the Appellate Division.

Since petitioner cannot satisfy the first prong of Capellan, his Fourth Amendment claim can succeed only if he can show that there was "an unconscionable breakdown in the underlying process." Capellan v. Riley, supra, 975 F.2d at 70, citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc). "An unconscionable breakdown occurs when the state court fails to conduct a reasoned inquiry into the petitioner's claim." Valtin v. Hollins, supra, 248 F. Supp.2d at 317, citing Papile v. Hernandez, 697 F. Supp. 626, 633 (E.D.N.Y. 1988). See also Vega v. Artuz, 97 Civ. 3775 (LTS)(JCF), 2002 WL 252764 at *12 (S.D.N.Y. Feb. 20, 2002) (stating "some sort of 'disruption or obstruction of a state proceeding' is typical of [an unconscionable breakdown]"), quoting Capellan v. Riley, supra, 975 F.2d at 70.

Although petitioner disagrees with the result reached by New York's courts, he cannot claim with a straight face that

the state failed to conduct a reasoned inquiry.  The Trial Court

conducted a pre-trial hearing, after which it issued an oral and

a written decision setting forth its findings of fact and conclu-

sions of law (Pet. Brf. at 12-14; Transcript of Proceedings dated

July 24, 2002 at 927-29; Transcript of Proceedings dated  Aug. 7,

2002 at 951-52).  Petitioner litigated his claim again on direct

appeal to the Appellate Division, which also addressed peti-

tioner's Fourth Amendment claims and rejected them on the merits.

People v. Moss, supra, 22 A.D.3d at 329-30, 802 N.Y.S.2d at 148.

At both the trial and appellate levels, petitioner was assisted

by counsel.  Given this record, it is clear that petitioner was

afforded a "reasoned inquiry" concerning his Fourth Amendment

claim.  See Brown v. Donnelly, 371 F. Supp.2d 332, 339 (W.D.N.Y.

2005) ("[Petitioner's] various applications at the trial court

and appellate levels challenging the search warrant clearly show

that he was given an opportunity for a 'full and fair' litigation

of his Fourth Amendment claim."); Quick v. Allard, 04-CV-2069

(FB), 2004 WL 2326376 at *2 (E.D.N.Y. Oct. 12, 2004) (same);

Neish v. Reynolds, 9:97-CV-1901 (TJM)(GLS), 2000 WL 33743383 at

*5 (N.D.N.Y. Nov. 30, 2000) (same).

Petitioner's disagreement with the result reached by

New York's courts, even if justified, does not support the

conclusion that there was an "unconscionable breakdown" and does

not permit petitioner's Fourth Amendment claims to be re-liti-

gated.  See Capellan v. Riley, supra, 975 F.2d at 71 ("Even if [petitioner] were correct in his allegation that the Appellate Division erroneously decided this issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result."); accord Gates v. Henderson, supra, 568 F.2d at 840.

Accordingly, since petitioner was afforded the opportunity to litigate his Fourth Amendment claims at the suppression hearing and on appeal, and can point to no "unconscionable breakdown" in the system, his Fourth Amendment claim cannot be re-litigated here.  See Baker v. Bennett, supra, 235 F. Supp.2d at 307.

B.  Petitioner's Claim
Concerning His Sentencing

1.  Standard of Review

A habeas petitioner must meet a stringent standard before a federal court can issue the writ.  Specifically, habeas relief may be granted only when the state court's decision:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has explained these alternative standards:

> First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). See also Early v. Packer, 537 U.S. 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). . . .
>
> Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an "unreasonable application" of clearly established law. As we have explained:
>
>> "[A] federal habeas court may not issue the writ simply because that court concludes in its inde-pendent judgment that the state-court decision applied [a Supreme Court case] incorrectly. See Bell v. Cone, 535 U.S. 685, 698-699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Williams, supra, at 411, 120 S.Ct. 1495. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner."
>
> Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

Price v. Vincent, 538 U.S. 634, 640-41 (2003); accord Brown v. Payton, 544 U.S. 133, 139-40 (2005); see also Lockyer v. Andrade, 538 U.S. 63, 70-72 (2003); Hawkins v. Costello, 460 F.3d 238, 242-43 (2d Cir. 2006); Brown v. Artuz, 283 F.3d 492, 500-01 (2d Cir. 2002).

In addition to the definition of "unreasonable applica-tion" set forth above, a state court may unreasonably apply

17

Supreme Court precedent "if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreasonably fails to extend a legal rule to a context in which the rule reasonably should apply."  Serrano v. Fischer, 412 F.3d 292, 296-97 (2d Cir. 2005), cert. denied, 126 S.Ct. 1357 (2006).  "Unreasonableness is determined by an 'objective' standard."  Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005), cert. denied, 126 S.Ct. 2882 (2006), quoting Williams v. Taylor, 529 U.S. 362, 409 (2000).  In order for a state court's application of Supreme Court precedent to be unreasonable, "[s]ome increment of incorrectness beyond error" is required.  Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005), cert. denied, 126 S.Ct. 1622 (2006) (internal quotation marks omitted); accord Brown v. Artuz, supra, 283 F.3d at 500-01; Aparicio v. Artuz, supra, 269 F.3d at 94.  However, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'"  Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000), quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 889 (3d Cir. 1999)(en banc); accord Gersten v. Senkowski, supra, 426 F.3d at 607.

The nature of the rule in issue also impacts the assessment of the reasonableness of the state court's action.

> [W]hile very specific rules may not permit much leeway in their interpretation, the same is not true of more general rules, the meaning of which "must emerge in application over the course of time."  [Yarborough v.

18

>*Alvarado*, 541 U.S. 652, 664 (2004)]. "The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Id*.

*Serrano v. Fischer*, *supra*, 412 F.3d at 297; *see* *also* *Hawkins v. Costello*, *supra*, 460 F.3d at 243.

Both the "contrary to" and "unreasonable application" clauses "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor*, *supra*, 529 U.S. at 412. "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker*, 341 F.3d 104, 110 (2d Cir. 2003); *accord* *DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002).

To be entitled to the deferential standard of review under subsection 2254(d), the state courts must have resolved the petitioner's claims "on the merits." *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003); *see* *also* *Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir. 2002)("[I]n order for this deferential standard of §2254 to apply, we must first determine that the state court considered [petitioner's claim] on its merits."); *Sellan v. Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001).

The Second Circuit has instructed habeas courts to "classify" a state court decision as either: (1) "fairly appearing to rest primarily on federal law or to be interwoven with federal law"; or (2) "fairly appearing to rest primarily on state procedural law." Jimenez v. Walker, 458 F.3d 130, 145 (2d Cir. 2006). "If the state court's decision falls into the first category, and does not 'contain a clear statement of reliance on a state procedural bar,' the decision must be treated as having been made on the merits." Mateo v. Fishkill Corr. Facility, CV-04-3420 (DGT), 2007 WL 2362205 at *5 (E.D.N.Y. Aug. 14, 2007), quoting Jimenez v. Walker, supra, 458 F.3d at 138. To make this classification, habeas courts in this circuit examine "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." Jimenez v. Walker, supra, 458 F.3d at 145 n.16.

Here, upon examining these factors, I conclude that the Appellate Division adjudicated petitioner's sentencing claim on the merits. In rejecting this claim, the Appellate Division stated: "Defendant's constitutional challenge to the sentencing scheme for murder in the first degree is unavailing (People v Hansen, 99 NY2d 339 [2003])." People v. Moss, supra, 22 A.D.3d at 330, 802 N.Y.S.2d at 149.

This language and the citation do not provide a "clear statement" that the Appellate Division relied on a state procedural bar to reach its decision. People v. Hansen, 99 N.Y.2d 339, 786 N.E.2d 21, 756 N.Y.S.2d 122 (2003), upon which the Appellate Division relied, unquestionably addressed the merits of petitioners's claim, carefully explaining, with citation to numerous federal authorities, why a finding by a jury concerning sentencing was not necessary in non-capital cases. The Appellate Divisions's express reliance on Hansen as controlling precedent, is compelling evidence that it considered the "substance" of petitioner's claim.

Because the Appellate Division adjudicated petitioner's sentencing claim on the merits, its decision on this claim is entitled to the deferential standard of review set forth in 28 U.S.C. § 2254(d).

     2.   The Merits of
           Petitioner's Sentencing Claim

Petitioner's sentencing claim arises out of those provisions of New York law that establish different sentencing procedures in murder cases depending on whether the prosecution seeks the death penalty.[6]

---

[6]The explanation of New York's sentencing procedures set forth herein is based largely on the explanation provided by the Honorable Gerard E. Lynch, United States District Judge, in
(continued...)

An individual convicted of murder in the first degree in New York faces three alternative sentences, namely death, life imprisonment without the possibility of parole or an indeterminate term of imprisonment, the minimum term of which must be between 20 and 25 years and the maximum term of which must be life. N.Y. Penal L. §§ 60.06, 70.00(2), (3). If the prosecutor seeks the death penalty, and if the jury finds the defendant guilty of murder in the first degree, a separate sentencing proceeding is conducted before the jury to determine the appropriate sentence. N.Y. Crim. Proc. L. § 400.27(2). If the jury unanimously agrees that death should be imposed, the Trial Court must impose the death sentence. N.Y. Crim. Proc. L. § 400.27(11)(a), (d). If the jury unanimously agrees that a sentence of life without parole should be imposed, the trial court must impose that sentence. N.Y. Crim. Proc. L. § 400.27(e). If the jury is unable to agree unanimously on either death or life without parole, sentencing reverts to the trial judge who is permitted to impose a maximum sentence of an indeterminate term of imprisonment, the minimum term of which must be between 20 and 25 years of imprisonment and the maximum term of which must be life. N.Y. Crim. Proc. L. § 400.27(11)(c). Thus, where the prosecutor seeks the death penalty, the vote of a

_____

[6](...continued)
Holland v. Donnelly, 216 F. Supp.2d 227 (S.D.N.Y. 2002), aff'd, 324 F.3d 99 (2d Cir. 2003).

single juror could preclude the imposition of both the death sentence and a sentence of life without parole.

If, on the other hand, the prosecutor does not seek the death penalty, the discretion to impose sentence is vested exclusively in the trial judge who may impose a sentence of either life without parole or an indeterminate sentence with a minimum term of 20 to 25 years and a maximum term of life. Holland v. Donnelly, supra, 216 F. Supp.2d at 241. So long as death is an authorized punishment, there are no statutory limits on the prosecutor's discretion to seek or not to seek the death penalty. Holland v. Donnelly, supra, 216 F. Supp.2d at 241.

The prosecutor did not seek the death penalty in petitioner's case. Thus, no jury ever considered what sentence was appropriate for petitioner. The trial judge and the trial judge alone retained the discretion to sentence petitioner to a sentence of life without parole, or an indeterminate sentence with the possibility of parole after service of the minimum term of 20 to 25 years and chose the former course.

To the extent petitioner is arguing that the manner in which sentence was imposed violates his right to Due Process, the nature of his argument is unclear. The memoranda of law petitioner has submitted in support of his petition contains a point heading that reads "The disparate sentencing provisions of N.Y. Crim. Proc. Law 400.27 deprived Clarence Moss of equal protection

and due process of law" (Amended Petition (Docket Item 4) at the second page petitioner designated as page 5; Second Amended Petition (Docket Item 6) at the page petitioner designated as page 45). The memoranda do not, however, explain the nature of the Due Process violation petitioner is asserting. Petitioner's brief to the Appellate Division of the Supreme Court suffers from the same deficiency (Resp. Brf. at 45-46). In all three documents, all that petitioner does is to state the unique nature of the death penalty and then state: "However, once the state had granted to some accused persons the right to a jury determination on the entirely different issue of whether to impose a sentence of life without parole, as opposed to some other sentence of incarceration, for first degree murder, equal protection demands that all persons who have not pleaded guilty, share the same right to a jury determination of whether to impose a sentence of life without parole" (Amended Petition (Docket Item 4) at the second page petitioner designated as page 6; Second Amended Petition (Docket Item 6) at the page petitioner designated as page 46; Resp. Brf. at 46 (emphasis in originals)).

The foregoing simply does not state a Due Process violation. As the very words used by petitioner and his counsel demonstrate, plaintiff's claim is based on an alleged violation of the Equal Protection clause. Accordingly, I do not understand plaintiff to be asserting any claim for a violation of his Due

Process rights that is independent of his right to Equal Protection.

To the extent petitioner is asserting that the difference between the treatment afforded to defendants for whom the prosecution seeks the death penalty and the treatment afforded to defendants for whom the death penalty is not sought violates the Equal Protection Clause, his argument was squarely rejected by Judge Lynch in Holland v. Donnelly, supra, 216 F. Supp.2d at 242-48.

In reaching this result, Judge Lynch first noted that the decisions of New York's appellate courts' rejecting Holland's Equal Protection claim was not contrary to any decision of the United States Supreme Court and, therefore, habeas corpus relief could be granted only if the state court's rejection of the Equal Protection challenge constituted an "unreasonable application" of Supreme Court precedent. 216 F. Supp.2d at 243-44.

Turning to the issue of whether New York's rejection of petitioner's Equal Protection claim constituted an "unreasonable application" of Supreme Court precedent, Judge Lynch first noted that the option of a sentence of life without parole plays different roles in capital and non-capital cases. In the former class of cases, Judge Lynch characterized the option of life without parole as an "adjunct alternative" to the jury's function

of deciding whether to impose the death penalty.  216 F. Supp.2d at 244.

Judge Lynch then noted that in cases where death was not a possible sentence, judges, and not juries, routinely imposed sentence and that a wide number of jurisdictions permitted judges to impose unilaterally a sentence of life imprisonment without parole for a range of offenses.  Thus, although life without parole is, no doubt, an extremely harsh sentence, Judge Lynch concluded there was "nothing suspicious, irrational or even unusual" about permitting a judge to impose such a sentence unilaterally.  216 F. Supp.2d at 245-46.

Judge Lynch next observed that in capital cases, the option of life without parole tended to "mitigate[] the likelihood" that the jury would impose the death penalty because it provided the jury with a sentencing option that insured the public would be forever protected from the defendant.

> Giving the jury the option of imposing that sentence, with the same stringent requirements of unanimous decision-making and an affirmative vote to require life without parole that apply to the death sentence, serves the benevolent purpose of restricting the death penalty to cases where the jury believes that the ultimate sanction is absolutely necessary.  Since the New York death penalty statute is particularly narrow and restrictive, and was finally adopted in 1995 after more than twenty years of political controversy and de facto abolition, the legislature presumably intended this result.

216 F. Supp.2d at 246.

In cases where the death penalty is not sought, permitting the trial judge unilaterally to impose a sentence of life without parole ensures that the public will be adequately protected regardless of the prosecutor's decision.

> The availability of life without parole in this circumstance evidently represents a trade-off for the liberal availability of prosecutorial discretion, provided as a hedge against the concern that prosecutors exercising this discretion might fail to be sufficiently zealous in protecting the public; in exchange for giving the prosecutor an unbridled option to exercise mercy, the state requires that the judge have an option of guaranteeing public safety by imposing an unparolable life term.

216 F. Supp.2d at 246-47.

Judge Lynch then went on to address the most troubling quirk in New York's statutory scheme, namely that life without parole was not a sentencing option in cases where the death penalty had originally been sought but the jury had been unable to agree unanimously on an appropriate sentence. Judge Lynch concluded that this limitation was, nevertheless, rational because it prevented the prosecution from seeking a sentence of life without parole from multiple decision makers in the same case.

> If New York's system functions as intended, prosecutors will seek the death sentence only in the most extreme cases, in which a plausible case can be made for the ultimate sanction, and in which it can be expected that juries will frequently find life without parole a desirable option. Where the jury has rejected this penalty, or failed to agree on it, the prosecutor has had the chance, on behalf of the public, to seek that sentence. The legislature could reasonably find that

27

there is no need to allow the prosecutor a chance to
repeat his unsuccessful argument to another
decisionmaker.  Where the prosecutor has <u>not</u> sought a
capital sentence, on the other hand, life without
parole has not been rejected either by the prosecutor
or by a jury, and under these circumstances it is a
reasonable legislative choice to give the prosecution
an opportunity to seek the imposition of this penalty.

216 F. Supp.2d 247 (emphasis in original).

In conclusion, although Judge Lynch agreed that New
York's statutory scheme for imposing a sentence of life without
parole was imperfect, it was not so deficient that it was irra-
tional, nor was it so deficient that New York's rejection of
petitioner's Equal Protection claim could be characterized as an
"unreasonable application" of Supreme Court precedent.

Looked at in isolation, as [petitioner] would have
us do, the inconsistency in procedure to which he calls
attention is not susceptible to elegant rationaliza-
tion.  But legislation is a product of compromise, and
courts are appropriately reluctant to find violations
of fundamental constitutional principle in the incon-
gruities that sometimes result.  <u>Cf</u>. <u>Metropolitan Life
Ins. Co. v. Ward</u>, 470 U.S. 869, 898, 105 S.Ct. 1676, 84
L.Ed.2d 751 (1985) ("Rational basis scrutiny does not
require that the classification be mathematically
precise . . . [or] 'demand a surveyor's precision' in
fashioning classifications").  Taken as a whole, and in
context, the New York legislature was not irrational in
providing a life without parole sentencing option both
where the jury determines the sentence (because the
death penalty is in play) and where sentencing is for
the judge (because it is not).  Each sentencing proce-
dure necessarily operates differently, but the options
provided within each sentencing system are rational in
light of the different goals and problems pursued in
death and non-death cases.  If, as a consequence of the
different legislative choices made for each procedural
setting, inconsistencies develop between what would
appear to be analogous functions in the different
contexts, even if it is possible to imagine alternative

28

> solutions that might resolve the inconsistency without
> apparent damage to the policies being pursued, that
> does not mean that the legislature's choices are not
> rationally related to the important and difficult
> public policies it is pursuing.

216 F. Supp.2d at 247-48.

Judge Lynch's analysis of the Equal Protection claim in Holland was affirmed and adopted by the Court of Appeals. Holland v. Donnelly, supra, 324 F.3d at 101.

With one minor exception discussed below, petitioner's arguments here are the same as the arguments asserted in Holland. Since the decision in Holland is the law of the Circuit, it requires the dismissal of petitioner's Equal Protection claim.

The one point of departure between petitioner's claim and the Equal Protection claim in Holland is petitioner's contention that the difference in treatment afforded to defendants in death-penalty and non-death-penalty cases should be analyzed under the strict scrutiny test. Judge Lynch in Holland utilized the rational-basis test to assess the petitioner's Equal Protection claim. 216 F. Supp.2d at 247-48. Petitioner here contends that the strict scrutiny test should be applied because the statutory scheme in issue affects a fundamental right and liberty, namely the right to a trial by jury and to protection against the deprivation of liberty without due process (Amended Petition (Docket Item 4) at the second page petitioner designated page 7; Second Amended Petition (Docket Item 6) at the page

petitioner designated as page 47; Resp. Brf. at 47, <u>all</u> <u>citing</u>
<u>Harper v. Virginia State Bd. of Elections</u>, 383 U.S. 663, 670
(1966) ("[W]here fundamental rights and liberties are asserted
under the Equal Protection Clause, classifications which might
invade or restrain them must be closely scrutinized and carefully
confined.")).

There are several problems with petitioner's conten-
tion.  First, except in cases where the presence of aggravating
factors permit the imposition of a sentence above what would
otherwise be the statutory maximum, a criminal defendant has no
constitutional right to a jury trial with respect to sentencing.
See <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 469 (2000).  As Judge
Lynch noted in <u>Holland</u>:

> A jury found [petitioner] guilty of first-degree mur-
> der, having properly found all the elements of that
> offense beyond a reasonable doubt, under instructions
> not challenged here.  Life without parole, the sentence
> imposed on [petitioner], is expressly authorized as a
> punishment for the crime found by the jury, N.Y. Penal
> L. § 60.06, without the need for any additional fact-
> finding by the judge.

<u>Holland v. Donnelly</u>, <u>supra</u>, 216 F. Supp.2d at 241.  Thus, peti-
tioner simply had no right, fundamental or otherwise, to a trial
by jury concerning the sentence to be imposed on him.

Second, states have broad discretion in determining the
scope of their criminal laws and in determining the relative
seriousness of violations of those laws.  "Save as limited by
constitutional provisions safeguarding individual rights, a State

may choose means to protect itself and its people against criminal violation of its laws.  The comparative gravity of criminal offenses and whether their consequences are more or less injurious are matters for its determination." <u>Pennsylvania v. Ashe</u>, 302 U.S. 51, 55 (1937).  Petitioner cites no cases, and my own research has disclosed none, in which a strict- or heightened-scrutiny test has been applied to distinctions made in a state's criminal law that did not involve membership in a suspect classification.  Given this broad discretion possessed by the states concerning matters of criminal law, the absence of authority supporting petitioner's contention and the fact that the strict-scrutiny test is applied only in exceptional circumstances, <u>see</u> <u>M.L.B. v. S.L.J.</u>,  519 U.S. 102, 115-16 (1996) ("Absent a fundamental interest or classification attracting heightened scrutiny, . . . the applicable equal protection standard is that of rational justification . . . ." (internal quotation marks omitted)), I conclude that applying a strict-scrutiny test to the distinction New York makes between cases in which the death penalty is sought and those in which it is not would be inconsistent with the deference that is accorded to states with respect to their criminal laws.  <u>See</u> <u>generally</u> <u>Patterson v. New York</u>, 432 U.S. 197, 201 (1977) ("[P]reventing and dealing with crime is much more the business of the States than it is of the Federal Government, . . . and . . . we should not lightly construe the Consti-

tution so as to intrude upon the administration of justice by the individual States."); accord McMillan v. Pennsylvania, 477 U.S. 79, 85 (1986). I conclude that petitioner's Equal Protection claim is properly analyzed under the rational basis test and that Holland is, therefore, controlling.

IV.  Conclusion

For the foregoing reasons, I respectfully recommend that the petition be denied in its entirety.

In addition, since petitioner has not made a substantial showing of the denial of a constitutional right, I also recommend that a certificate of appealability not be issued. 28 U.S.C. § 2253. To warrant the issuance of a certificate of appealability, "petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Middleton v. Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005)(per curiam) (internal quotation marks omitted); see also Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005)(per curiam). For the reasons set forth above, I conclude that there would be no difference of opinion among reasonable jurists that the petition should have been reviewed in a different manner or that petitioner should be encouraged to proceed further.

V.  <u>Objections</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report and Recommendation to file written objections.  <u>See</u> <u>also</u> Fed.R.Civ.P. 6(a) and 6(d). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Shira A. Scheindlin, United States District Judge, 500 Pearl Street, Room 1620, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Scheindlin. FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d

55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         January 18, 2008

                                   Respectfully submitted,

                                   HENRY PITMAN
                                   United States Magistrate Judge

Copies mailed to:

Mr. Clarence Moss
DIN No. 03-A-1442
Clinton Correctional Facility
Route 374, Cook Street
P.O. Box 2001
Dannemora, New York  12929-2001

Bryan Hughes, Esq.
Yael V. Levy, Esq.
Assistant District Attorneys
Bronx County
198 East 161st Street
Bronx, New York  10451